

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY



*Please reply to South Florida

**SOUTH FLORIDA**
150 East Palmetto Park Rd. Suite 800,
Boca Raton, Fl 33432
o. 561.465.7517 I f. 561.516.6188

**NORTH FLORIDA**
9995 Gate Pkwy N., Ste. 400
Jacksonville, FL 32246
o. 904.996.1100 I f. 904.996.1120

## SENT VIA OVERNIGHT MAIL:

| Brent Loring WHAT HURTS, LLC 2649 Erie Ave Cincinnati, OH 45208 | Sean Phillips Captain of M/Y "WHAT HURTS" 4675 Cornell Rd Cincinnati, OH 45241 |
|---|---|
| The Parkway Company 6420 Madison Rd Cincinnati, OH 45227-2024 | Sean Phillips Phillips Marine Group, LLC. 1000 5TH Street Suite 200-E5 Miami Beach, FL 33141 |

Re: Fast Response Marine Towing & Salvage vs. M/Y "WHAT HURTS",
et al.
**DOL:** 2/25/21
**Our File:** 2012.023

Gentlemen:

Please be advised that we represent Fast Response Marine Towing & Salvage , LLC and write to you as the representatives, brokers, registered agents, owners and/or operators of that certain 2019 60' foot Midnight Express, HIN: EXK60001J819, known as the M/Y "WHAT HURTS" Further to your prior communications in person and/or via telephone with Fast Response, Charles Hansen Jr., and/or Captain Bryant Niebruegge, please accept this as Fast Response Marine Towing & Salvage, LLC' s continued and following demand for a salvage award for services rendered to the vessel, her owners, and operators.

On February 25, 2021, professional salvor, Fast Response Marine Towing & Salvage ("Fast Response"), responded to and successfully salvaged the M/Y "WHAT HURTS" which was found in peril, at risk of loss, and posing a possible threat to the marine environment via the discharge of pollutants among other things. The owners and operators of the vessel by and through the vessel's Captain and mate requested Fast Response' s services and executed the Fast Response Standard Form Marine Salvage Contract (attached as Exhibit "A"). The professional salvage services provided by Fast Response are memorialized below along with a timeline of events which establish that the M/Y "WHAT HURTS" was in immediate peril and would have sunk but for the successful salvage services provided. The following is offered to facilitate the prompt, efficient resolution of Fast Response's claim. Although Fast Response's

**EXHIBIT**

**2**

 

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY

efforts to resolve the claim directly impassed, we resume efforts to resolve this claim prior to litigation and the potential seizure of the vessel, and look forward to an efficient, cost-effective resolution of this claim. Additional photographs and/or video are available upon request.

## THE SALVAGE OF THE M/Y "WHAT HURTS"



Fast Response is a professional marine salvage company which maintains multiple high-speed salvage vessels including but not limited to a military 24' RHIB Zodiac Hurricane (Unit 3), military 24' Willard Seaforce 730 RHIB (Unit 5), a Novamarine 30' RHIB Nightstalker (Unit 6), and a Nautica 22' RHIB (Unit 1), each manned with professional licensed salvage captains on standby 24/7/365 days a year.

As previously recorded with the state of Florida, the M/Y "WHAT HURTS" is a 2019, 60-foot, Midnight Express vessel depicted below:



 

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY

| Vessel Name: | M/Y WHAT HURTS | Florida Registration No.: | FL3634RV |
|---|---|---|---|
| Vessel Service: | Recreational | USCG Number: | 1303828 |
| Trade Indicator: | Recreational | Call Sign: | |
| Hull Material: | Fiberglass | Hull Number: | EXK60001J819 |
| Ship Builder: | Midnight Express | Year Built: | 2019 |
| | | Length (ft.): | 59'20" |
| Hailing Port: | | Hull Depth (ft.): | 3' |
| Owner: | The Parkway Company 6420 Madison RD Cincinnati OH, 45227 | Hull Breadth (ft.): | 15' |
| | | Gross Tonnage: | 17 Simplified |
| | | Net Tonnage: | 17 Simplified |
| Documentation Issuance Date: | Documentation Expiration August 7, 2020 | | August 31, 2021 |

At approximately 8:20 pm, Feb 25, 2021, Captain Sean Phillips contacted Fast Response advising that the M/Y "WHAT HURTS" was in peril and requesting immediate assistance. Sean Phillips advised that the M/Y "WHAT HURTS" located at Grove Harbor Marina, was in peril and sinking. Fast Response Unit 3 responded to this salvage arriving on scene in less than fifteen minutes running at high speed over 52kts, after sunset, in the dark. Unit #3 ran through unnavigable waterways, restricted areas, mooring fields, and channel markers. Fast Response Unit 5 followed with a second boat for towing operations.

Upon arrival, at approximately 8:35 pm, Fast Response found the M/Y "WHAT HURTS" taking on water. The vessel was sitting low in the water with motor cowlings near the water. If equipped, the high-water alarms were not sounding. The vessel was in peril and at risk of imminent loss and sinking. The vessel was rapidly taking on water. The vessel's bilge pumps were not operational. Batteries and generator were submerged. The vessel posed a pollution risk to the environment because of oil in the outboards and the 1000 gallons of fuel onboard. Had the water reached over the portside dive door, it would have freely flowed into the vessel causing her to list and capsize.

At approximately 8:45 pm Fast Response Captain Bryant Niebruegge boarded the vessel and initiated dewatering using a gas-powered 2-inch pump with a pumping capacity of 160 gal/minute to remove sea water from vital compartments. When the pump was deployed, there was approximately 2½ to 3 ft of water in the aft bilge. The water level was even with the top of the fire extinguisher mounted to a bulkhead. The origin and cause of the water intrusion was unknown at the time. The goal was to evacuate as much water as possible in order that the origin and cause of the water intrusion could be determined. By 11:45 pm approximately 7,200 gallons/57,600 lbs. of sea water had been evacuated from the vessel. The M/Y "WHAT HURTS" was stabilized and successfully salved.

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY

 

February 3, 2023
Page 4 of 13

At approximately 9:40 pm, Sean Phillips arrived on scene to survey and authorize the vessel to be towed to Merrill Stevens. At 10:00 pm, Sean Phillips authorized the vessel to be towed and Unit #5(Captain Chuck Hansen) was dispatched for towing. At 11:00 pm Unit #5 arrived on scene.

Sean Phillips advised that he was responsible for the vessel. At 11:15 pm Fast Response provided the Fast Response Standard Form Marine Salvage Contract to Sean Phillips who executed the contract and agreed to all terms.

From 11:00 - 11:30 p.m., Fast Response monitored dewatering pumps at idle to check rate of water flow, if any, coming in. At approximately 11:30 pm, Units #3, and #5 got underway in tow to Merril Stevens. At 12:45 am, the M/Y "WHAT HURTS" arrived at Merill Stevens. The intrusion of water had been controlled/maintained until the vessel was hauled out onto dry land at approximately 1:00am. Fast Response Unit #5 returned to its northern base arriving at approximately 02:00 am on Feb 26, 2021. Fast Response Unit #3 returned to its southern base arriving at approximately 01:40 am on Feb 26, 2021.

Absent Fast Response's professional skill and immediate response, the vessel would have sunk. Sean Phillips said, "If you were here 15 minutes later the vessel would have sunk". The vessel was flooding from an undetermined location and the bilge pumps were inoperable. During the salvage operation, the vessel also showed signs of instability listing aft. Environmental damage caused by a sinking, including pollutants and contaminates dispersed into the surrounding waters of Biscayne Bay was certain absent Fast Response's successful efforts. The vessel is designed to hold 1000 gallons of gasoline and was topped off (as per Sean Phillips). Additionally, the four engines on the vessel combined require approximately 32 quarts of lubricating oil. The power generators also hold lubricating oil. There are also additional contaminants on board including battery acid, insolation, petroleum products, cleaners, etc. that could have been introduced into the water.

## BLACKWALL/SALCON CALCULATION OF SALVAGE AWARDS

"Salvage is the reward or compensation allowed by the maritime law for service rendered in saving maritime property, at risk or in distress, by those under no legal obligation to render it, which results in a benefit to the property... *The Neshaminy,* 228 Fed. 285 (3rd Cir. 1915). The public policy underlying salvage awards in the Admiralty Court is to hold out a "continuing incentive to undertake the physical and financial risk entailed in salvage operations and to bring the property thus recovered into court for a salvage determination." *Cobb Coin Co., Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 525 F. Supp.186,207 (S.D. Fla. 1981). The United States Supreme Court in *The Sabine,* lOI U.S. 384, 384 (1879) held: "Salvage is the compensation allowed to persons by whose voluntary assistance a ship at sea or her cargo or both have been saved in whole or in part from impending sea peril, or in recovering such property from actual peril or loss, as in cases of shipwreck, derelict, or

 

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY

recapture."

"A marine peril exists where a vessel is in danger of being partially or totally lost and where it is not being successfully salved when the plaintiff voluntarily undertakes its salvage operation. *Southernmost Marine Services, Inc. v. One (1) 2000 Fifty Four Foot (54") Sea Ray Name M/V "Potential"*, 250 F. Supp. 2d 1367, 1377 (S.D. Fla. 2003).

The salvage award is unique to maritime law: it is <u>not</u> one of quantum meruit as compensation for work performed, but "is a bounty given on the grounds of public policy to encourage the rescue of life and property imperiled at sea and to foster maritime commerce." *Fine v. Rockwood*, 895 F.Supp. 306 (S.D. Fla. 1995).

*Flagship Marine Services, Inc. v. Belcher Towing Co.*, 761 F. Supp. 792 (S.D. Fla. 1991), made it clear that the value of time and materials provided by a professional salvor is only one factor in determining an appropriate salvage award, and an award may substantially exceed the value of time and materials. "The law creates an incentive for people to take risks to save ships that they are not obligated to save by imposing an obligation on the ship's owner to pay a reward for salvage services even if the owner would not have wanted those services rendered." *O'Hagan v. M&T Marine Group, LLC*, 424 Fed. Appx. 811, 816 (11th Cir. (Fla.) 2011).

As discussed in *Cobb Coin*, 549 F. Supp. at 557; *Cobb Coin*, 525 F. Supp. at 207, n.15(citing, *The Blackwall*, 77 U.S. (10 Wall.) 1, 14, 19 L.Ed. 870 (1869)); see also, 3A MARTIN J. NORRIS, BENEDICT ON ADMIRALTY: THE LAW OF SALVAGE §244 (7th ed.1998), the elements considered by an Admiralty Court when determining the amount of a salvage award are set for below:

| FACTORS DETERMINING AMOUNT OF SALVAGE AWARD | M/V "SYLVIA VT" SALVAGE |
|---|---|
| (1) The Labor Expended by the Salvors In Rendering the Salvage Service | **Fast Response Crew** <br> • Captain Chuck Hanson <br> • Captain Bryant Newbridge <br> • Unit 3 <br> • Unit 5 <br> **Salvage Duration** <br> • Time spent by Fast Response in the Salvage operation portal to portal: 5.20 hours. <br> • Started at 8:20 p.m. on February 25, 2021; and ended at 1:40 a.m. on February 26, 2021. |

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY

 

February 3, 2023
Page 6 of 13

| (2) The Promptitude, Skill and Energy Displayed in Rendering The Service And Saving The Property | • Due to Fast Response's skill and preparedness, a salvage vessel was on scene and salvage operations were underway within 15 minutes from dispatch. Fast Response reacted immediately. Even a small delay would have placed the vessel at risk of being completely submerged or rolling.<br>• At approximately 8:20 pm on February 25, 2021, the vessel was in peril and at imminent loss of sinking.<br>• The high-water alarms were not sounding.<br>• The vessel's bilge pumps were not operational.<br>• Batteries and generator were submerged.<br>• The vessel posed a pollution risk to the environment because of oil in the outboards and the 1000 gallons of fuel onboard.<br>• When Fast Response arrived, there was approximately 2½ to 3 ft of water in the aft bilge. The water level was even with the top of the fire extinguisher mounted to a bulkhead. The origin and cause of the water intrusion was unknown at the time.<br>• By 11:45 pm, approximately 7,200 gallons/57,600 lbs. of sea water had been evacuated from the vessel.<br>• Fast Response prevented the sinking and total loss of the vessel.<br>• Fast Response Marine Towing & Salvage maintains salvage and life saving gear at the ready at all times. Fast Response also employs highly skilled salvage captains and crew. Captain Chuck Hansen Jr. is a USGC licensed Master with approximately sixteen years of salvage experience, prior to owning Fast Response, and an additional eight years as owner of Fast Response with fifteen years' experience as a towboat Captain. Bryant Niebruegge holds a 100-ton Master Sea Captain License as well as a bachelor's |
| --- | --- |

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY

 

February 3, 2023
Page 7 of 13

| | |
|---|---|
| | degree in Management and Human Resources, and has over two years of salvage and towboat experience. |
| (3) The Value Of The Property Employed By The Salvers In Rendering The Service And The Danger To Which Such Property Was Exposed | **Total Equipment Value S117A00**<br>Fast Response Unit 3 ($80,000) and Unit 5 ($70,000) plus:<br>• Intake and discharge hoses with strainers and fire nozzles ($550)<br>• Electrical Pumps ($475)<br>• 2x2 inch dewatering pumps ($600)<br>• Dive tanks, dive gear, airbags, manifolds and compressors ($4,250)<br>• 5x50 ft. absorbent boom and 200 pads ($325)<br>• Intake and discharge hoses with strainers and fire nozzles ($550)<br>• Electrical Pumps ($475)<br>• 2x2 inch dewatering pumps ($600)<br>• Dive tanks, dive gear, airbags, manifolds and compressors ($4,250)<br>• 5x50 ft. absorbent boom and 200 pads ($325) |
| (4) The Risk Incurred by The Salvers in Securing the Property from The Impending Peril | • Fast Response received the call of a vessel in peril at night and responded at high speed over 52 knots arriving in less than 15 minutes in the dark.<br>• All the work was performed at night in the dark.<br>• Unit #3 ran through unnavigable waterways, restricted areas, mooring fields, and channel markers. Fast Response Unit 5 followed with a second boat for towing operations.<br>• The vessel was sitting low in the water with motor cowlings near the water when Fast Response arrived on scene.<br>• If equipped, the high-water alarms were not sounding.<br>• The vessel was taking on water. |

 

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY

|  |  |
|---|---|
|  | • The vessel's bilge pumps were not operational.<br>• Batteries and generator were submerged.<br>• The vessel posed a pollution risk to the environment because of oil in the outboards and the 1000 gallons of fuel onboard. Had the water reached over the portside dive door, it would have freely flowed into the vessel causing her to list and capsize.<br>• When Fast Response arrived, there was approximately 2½ to 3 ft of water in the aft bilge. The water level was even with the top of the fire extinguisher mounted to a bulkhead. The origin and cause of the water intrusion was unknown at the time.<br>• There was a personal injury risk of the vessel were to shift, sink or roll over with Fast Response crew and equipment onboard.<br>• Moreover, Fast Response crew boarded the vessel taking on water and a risk of electrical shock due to the batteries and submerged electrical components, as well as exposure to excessive heat, and oil carcinogens. |
| **(5) The Value of The Property Saved**<br><br>As discussed in *Atlantis Marine Towing, Inc. v. M/V Elizabeth*, 346 F. Supp. 2d 1266, 1273 (S.D. Fla. 2004), "The salved value is the post-casualty value of the property, in her damaged state, at the time of the salvage or after the vessel is brought into safe harbor." See also, *Beach Salvage Corp. v. The Capt. Tom.*, 201 F. Supp. 479, 483 (S.D. Fla. 1961); 3A Martin J. Norris, *Benedict on Admiralty* §259 (1992). The value of the salved boat, however, is only one of the factors to be considered in fixing a salvage award and should not be the principal guide for determining the award but should be | • Post casualty value of the M/Y "WHAT HURTS" $1,600,000 (see below). |

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY




February 3, 2023
Page 9 of 13

| | |
|---|---|
| merely a factor to be considered along with others. Id. See also, *Ocean Services Towing and Salvage, Inc. v. Brown*, 810 F. Supp 1258, 1263 (S D. Fla. 1993)(citing *The New Camelia*, 105 F. 637, 640-41 (5th Cir. 1900). | |
| (6) The Degree of Danger from Which The Property Was Rescued | • An emergency was reported on board and that the vessel is in immediate peril of sinking. The vessel was at a critical point that catastrophic loss could occur. |
| (7) SALCON FACTOR: The Skill and Efforts of The Salvors In Preventing Or Minimizing Damage To The Environment | • Fast Response prevented the sinking and total loss of the vessel and associated environmental hazard.<br>• When Fast Response boarded the vessel, there was approximately 2½ to 3 ft of water in the aft bilge. The water level was even with the top of the fire extinguisher mounted to a bulkhead.<br>• Due to Fast Response's skill and effort to locate the vessel and immediately dewater within minutes of accessing the vessel while she was sinking, the M/Y "WHAT HURTS" did not discharge any oil out of the engines nor spill any diesel fuel in the coastal waters. The vessel was holding 1000 gallons of fuel and gallons of oil, so the exposure risk is evident. There are additional contaminants on board which should also be considered, i.e.: battery acid, insulation, other petroleum products, cleaners could have been introduced into the environment but were not because of Fast Response 's prompt actions.<br>• Due to the immediate action of Fast Response, environmental impact was minimized. |

## REPRESENTATIVE 11TH CIRCUIT AND SOUTHERN DISTRICT OF FLORIDA SALVAGE AWARDS

 

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY

February 3, 2023
Page 10 of 13

**50.0%-** *Ocean Services Towing & Salvage, Inc. v. Kenneth Brown and Muriel Brown, and SIY Asylum, etc.*, 1993 AMC 2701 (S. Dist. Fla. 1993). 50% salvage award where a sailboat in open water in fair weather off Florida coast sprung uncontrollable leak. Pumps provided by USCG, salvors placed on board, and boat was towed to safety.

**37.5%** - *Southernmost Marine Servs. v. M/V Potential*, 250 F.Supp. 1367 (S.D. Fla. 2003). 37.5% salvage award. Professional salvor rescued owner and three passengers and removed sinking vessel with flooded engine room from jetty performing underwater salvage operations and restoring engines to working order in a two-day salvage operation.

**25%** - *Atlantis Marine Towing, Inc. v. M/V Elizabeth*, 346 F. Supp. 2d 1266, 1276 (S.D. Fla. 2004). Seventy-foot Feadship sportfishing vessel moored to a pier caught fire. Salvor responded and successfully fought the fire for 5-10 minutes prior to the arrival of city firefighters and remained for three hours. The salvor's efforts helped to save the vessel which was clearly on fire and a risk existed of the fire spreading causing severe damage to the dock and other boats moored adjacent. The salvor's speedy arrival minimized the ultimate damage to the vessel and prevented what could have been a much greater catastrophe had fire-fighting efforts commenced only upon the arrival of the city firefighters. Fair market post casualty value of the vessel was not clearly established. The salvor calculated pre-casualty value minus cost of repairs which yielded $1,220,000. The vessel owner's surveyor placed post casualty value at $650,000. The Court awarded $150,000 to the salvor.

**18.6%** - *Flagship Marine Services, Inc. dlb/a Sea Tow Services of Lee County vs. Belcher Towing Company, et al.*, 761 F. Supp. 792 (S. Dist. Fla. 1991). 18.6% salvage award for salvage of vessel rapidly taking on water in the engine room in the inland waterway.

**15.0%** - *O'Hagan v. M&T Marine Group, LLC*, 424 Fed. Appx. 811 (11th Cir. (Fla.) 2011). Non-professional salvors cut lines connecting yachts with floating dock that was sinking and pulling yachts under with them during storm. Salvors relocated the vessels to nearby seawall, pumped out water and secured them. Court awarded 15% of vessel value totaling $290,700.00.

**13.0%** - *Towboat Nantucket, 2014 AMC 2042* (N.Y. Nov. 15, 2013). Vessel ran aground. Arbitration panel determined there was minimal risk to the salvor. The salvor was successful in his efforts and took about 3 hours to complete. The arbitrators awarded 13% of the value of the vessel plus interest.

**12.0%-** *Girard v. M/Y "Quality Time"*, 4 F.Supp. 3d 1352 (S. Dist. Fla. 2014) affirmed on appeal (2015 AMC 425 (11th Cir. 2015)). Vessel struck a submerged object and was taking on water in the northwest channel approaching Key West, Florida. The Court awarded 12.0 percent salvage award (10 % salvage and 2% uplift for professional salvor status) for services of patching, pumping, and towing provided from a small skiff.

**10.0%** - *Biscayne Towing & Salvage v. Kilo Alfa, Ltd., et al.*, 2005 AMC 129 (S. Dist. Fla. 2004). Court awarded professional salvor l0% of salved value where yacht was sinking at pier and salvor pumped vessel out using a single three-inch pump.



10.0% - *Reliable Salvage & Towing, Inc. v. 35' Sea Ray,* 2011 AMC 712 (M. Dist. Fla. 2011). 10% salvage award plus attorney's fees, after the vessel owner admitted to owing the salvage award but refused to pay.

7.5% - *Miami Yacht Divers, Inc. v. M/V All Access, et al.*, 2008 AMC 170 (S. Dist. Fla. 2007). Salvors disentangled dock lines and retrieved vessel that had broken away from her dock in residential canal approximately 8-10 houses away. No special equipment was employed. The salvor simply swam to the vessel to retrieve the tangled line. The entire operation was completed in 30 minutes comprised of one minute to catch and secure the vessel, and an additional 20-30 minutes inspecting her.

### Fast Response Salvage Demand

On the date of the salvage, a 2019, 60-foot, Midnight Express was listed for a base price of $1,600,000.00 with no options as set forth on the attached materials obtained from power and motoryacht.com. *See*, Exhibit "B". The M/Y "What Hurts" was new at the time and had significant upgrades and added features. Due to Fast Response's efforts, the water damage may have been limited to the generator and systems below deck. The engines were saved from going under. Fast Response understands that the vessel was fully repaired and operational within a week post incident. Fast Response's efforts certainly preserved the value of the vessel. Accordingly, for purposes of this demand, the post casualty value of the vessel is $1,600,000.00.

The professional salvage services provided by Fast Response saved the M/Y "WHAT HURTS" from total loss and abated environmental hazard entitling Fast Response to a significant salvage award. In light of the circumstances of the salvage as set forth in section "The Salvage of the M/Y "WHAT HURTS" above; the application of the Blackwall/Salcon Calculation of Salvage Awards; and recognizing the Historical Representative 11th Circuit and Southern District of Florida Salvage Awards, Fast Response's services provided to the M/Y "WHAT HURTS" clearly exceed the 15% awarded in *O'Hagan,* and fall somewhere between the 18.6% award ordered in *Flagship Marine Services, Inc. d/b/a Sea Tow Services of Lee County vs. Belcher Towing Company, et al.* and the 37.5% award ordered in *Southernmost Marine Servs. v. M/V Potential.* For purposes of resolving this claim within the next 30 days, Fast Response is, however, willing to accept a principal salvage award of 18.6%. In the utmost good faith and for purposes of fostering resolution, Fast Response is also willing to accept a post casualty vessel valuation of $1,600,000.00, notwithstanding that the value of the fuel and charter hire is not included in the listing, and the repair expenses have not been provided by the owners/operators of the vessel. Accordingly, Fast Response is willing to accept a principal salvage award of $297,600.00.

### Equitable Uplift for Professional Salvage Operations

As a professional marine salvor, and in accord with the general maritime law, Fast Response is entitled to an equitable uplift or premium on the principal salvage award. *B. V. BureauWiismuller v United States,* 487 F. Supp. 156 (S.D. NY 1979); *Girard v. M/Y "Quality Time",* 4 F.Supp. 3d 1352

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY

 

February 3, 2023
Page 12 of 13

(S.D. Fla. 2014), *aff'd,* 2015 AMC 425 (11th Cir. 2015). Should this matter proceed to litigation, Fast Response will request a 5% uplift. In the interests of resolution, however, Fast Response is willing to waive the equitable uplift if, and only if, the salvage demand is paid within 30 days from the date of this demand.

### Prejudgment Interest

Fast Response is further entitled to prejudgment interest. *Complaint of M/V Vulcan,* 553 F.2d 489, 490-91(5th Cir. 1977) ("In admiralty cases, the award of prejudgment interest from the date of loss is the rule rather than the exception."). The Standard Form Marine Salvage Contract signed by the Defendants in this matter provides for the calculation of interest at the rate of 1.5% per month from February 25, 2021 which equates to 18% per year. In the interests of resolution, however, Fast Response is willing to waive interest if, and only if, the salvage demand is paid within 30 days from the date of this demand.

### Contractual Attorney Fees

Finally, Fast Response is entitled to an award of contractual attorney fees. Should this matter proceed to the seizure of the vessel, litigation, trial and potentially an appeal, Fast Response anticipates that its attorney fees will easily exceed $250,000.00. The vessel's, her owner's and operator's attorney fees and litigation expense will mirror this. The parties will also incur expense for filing fees, custodial fees, expert witnesses, court reporters, etc. Accordingly, the vessel, her owners and operators' cumulative exposure to attorney fees and litigation expense could exceed the substantive amount in controversy. Therefore, it is clear this case should be resolved on best possible terms now. In the interests of resolution, Fast Response is therefore willing to absorb its own attorney fees if, and only if, the salvage demand is paid within 30 days from the date of this demand.

### Total Demand

Fast Reponses is willing to resolve this claim immediately and will provide a full release to the vessel, her owners, operators, and insurers in exchange for payment of the principal salvage award of 18.6%, totaling $297,600.00 to be paid within 30 days. Considering the exposure presented by this claim, this demand is a fair and reasonable representation of the settlement value of the claim commensurate with the applicable case authorities, representative awards, and operative facts of the salvage known to date.

We trust that you recognize the exposures at hand and will take this opportunity to resolve this matter promptly with Fast Response. We look forward to working with you to amicably resolve this salvage claim short of proceeding with litigation and hopefully in a manner that is acceptable to all concerned. Should you not be interested in resolution, we would request your soonest advices regarding the owner's ability to post security to avoid the seizure of the vessel and associated custodial legis expense.

**MICHAEL W. MCLEOD**
Board Certified Admiralty & Maritime Law
(California & Florida)
Admitted FL, CA, NY

 

### Statutory Request for Insurance Information

Finally, pursuant to Florida Statutes §627.4137, we further request that you, within thirty (30) days, provide a statement, under oath setting forth the following information with regard to each and every policy of insurance, including excess or umbrella insurance, in place covering you which does or may otherwise provide insurance coverage to pay all or any portion of the salvage claim made herein:

1. The name of the insurer;
2. The name of each insured;
3. The limits of policy coverage;
4. A statement of any policy or coverage defense which such insurer reasonably believes is available to such insurer at the time of filing such statement; and
5. A copy of each and every policy.

In addition to the preceding, we hereby request that you disclose the name and coverage of each known insurer, including any excess or umbrella insurer, and forward this salvage demand and request for insurance information to each and every insurer, including any excess or umbrella insurer, requesting each and every insurer to supply that requested information directly to the undersigned within thirty (30) days.

Please keep in mind that this request is made pursuant to Florida Statute and that it shall be your responsibility to comply with the request within thirty (30) days. You further have the responsibility to update the statement of insurance coverage provided immediately upon the discovery of any fact calling for an amendment.

As stated above, we will look forward to working with you toward an efficient, cost-effective resolution of this claim.

Respectfully Submitted,

Michael. McLeod, Esq.
Fla. Bar #956831
150 E Palmetto Park Rd, Suite 800
Boca Raton, FL 33432
Phone: (561) 465-7517
Fax: (561) 516-6188
E-Mail mmcleod@mcleodbrock.com

**FAST RESPONSE**

Marine Towing & Salvage

## NOTICE OF ASSIGNMENT OF PAYMENT

DIRECTIONS FOR MY INSURANCE COMPANY:

I (name) _BRENT LORING_ hereby instruct my Insurance

Company (name) _CINCINATTI_ to make payment directly to

Fast Response Marine Towing & Salvage, LLC. Located at 2880 NE 32nd St,

Lighthouse Point, Florida 33064, for the services rendered on (date) _25 FEB 2021_

to my vessel (name) _WHAT HURTS_ Fl or Doc Number_____.

I fully understand that payment will be made directly to Fast Response Marine

Towing & Salvage, LLC. and I have not signed this statement under duress.

Signed This Day_ _25_ _, Month _FEB_ , Year _2021_ .

Vessel Master / Owner_____

Witness X _____

_BRYANT NIEDNUEGO_

2880 NW 32nd Street • Lighthouse Point, Fl 33064 • www.fastresponseusa.com
Phone (305) 953-7524 • Fax (954) 785- 8946 • Email: fastresponsemt a gmail.co



EXHIBIT
A

# FAST RESPONSE

## Marine Towing & Salvage

### Standard Form Marine Salvage Contract

**IT IS HEREBY AGREED** This <u>25</u> (Day) of <u>FEB</u> (Month), 20<u>21</u> (Year),

At <u>11:00</u> ~~PM~~ hours (time) at <u>GROVE HARBOR</u> (Location) by and

between <u>SEAN PHILLIPS</u> (Owner or Captain) for the

Vessel named <u>WHAT HURTS</u> ("Vessel") which is described as

<u>2019 MIDNIGHT EXPRESS 60</u> (Year-Manufacturer-Length)

and insured by: <u>CINCINNATI</u> (Underwriter) and

**Fast Response Marine Towing and Salvage, LLC,** to salvage the Vessel under
the following terms and conditions:

1. Salvor agrees to render assistance to and endeavor to save said Vessel
and its property and deliver her afloat or ashore at

<u>MRK</u> marina or port as mutually agreed, or to the
nearest safe pot if unspecified herein, as soon as practicable.

2. Salvor shall have the requisite possession and control of the subject
Vessel and be entitled without expense to the reasonable use of the
Vessel and its gear in the performance of recovery or towing operations.

2880 NW 32nd Street • Lighthouse Point, Fl 33064 • www.fastresponsesusa.com
Phone (305) 953-7524 • Fax (954) 785-8946 • Email: fastresponsemt@gmail.com

3. Said salvage by the Salvor shall terminate upon delivery of the said Vessel as designated herein. Owner and underwriter shall be responsible for and storage, towing or other port or marina charges following delivery and for risk of loss thereafter.

4. Compensation to Salvor for the services performed hereunder shall be in accordance with the 1989 International Convention on Salvage (SALCON 1989). No agreement on price or its reasonableness has been made at the scene unless agreed to in writing.

5. Services hereunder are rendered on a "No Cure, No Pay" basis; however, Salvor shall be entitled to a reasonable payment for prevention or minimization of environmental damage in accordance with Articles 13 & 14 of the 1989 International Convention on Salvage, as well as for cleanup or wreck removal in the event the Vessel is deemed a constructive total loss. Payment is due promptly upon presentation of Salvor's bill. Interest at the rate one and one-half (1.5%) percent per month (or the maximum legal rate allowed) shall accrue on any unpaid balance from 30 days after completion of salvage and presentation of a salvage bill.

6. In the event of any dispute concerning the reasonableness of any fees or charges due hereunder, owner agrees, at the option of Fast Response Marine Towing & Salvage, LLC. , to submit the dispute to binding arbitration. Fast Response Marine Towing & Salvage, LLC. shall give written notice of its election to arbitrate.

7. It is understood that services performed herunder are governed by the Admiralty and Maritime Jurisdiction of the Federal Courts and create a maritime lean against the Vessel or its posted security. Salvor's lien shall be preserved until payment. Salvor agrees in lieu of arrest or attachment to accept from the Vessel's Underwriter, a Letter of Undertaking for an amount equal to one and one half (1.5) times the presented billing with a copy of the insurance policy and coverage information. If the Vessel is uninsured or is Underwriter cannot provide a Letter of Undertaking. Owner agrees to post a Surety Bond with Salvor's designated Escrow Agent in an amount equal to 1.5 times the Salvor's bill. If no Letter of Undertaking is provided by the insurance company approved by the Salvor, or Owner does not post a Surety Bond, Salvor may at its option litigate rather than arbitrate and may have the Vessel arrested and taken into custody of the United States Marshal pending receipt of payment in full. In any event, the Vessel shall not, without the consent of the Salvor, be removed from the port of delivery, until Salvor deems its payment secure. Salvor may satisfy collection of fees or charges hereunder by recourse to any security posted and shall also be entitled to any costs incurred in collection of payments due hereunder including reasonable attorney's fees, whether or not suit is brought and for representation in both Trial and Appellate Courts.

8. Salvor hereby warrants that it is acting on its own behalf and on behalf of any subcontractors retained by Salvor to perform services in the recovery or delivery of the Vessel. Salvor shall be responsible for any such subcontractor's compensation.

9. In the event the Salvor has already rendered salvage services to the described Vessel prior to execution of this contract, the provisions of this contract shall apply to such salvage services.

10. Salvor may maintain possession of the Vessel until it has been fully paid and shall be entitled to reasonable compensation for storage.

Owner/Operator Signature X

Print Name_____ Sw / Minnes_____

Address:____46 75 CORNELL RD____

City: CINCINNATI____ State: OH____ Zip: 45241

Home Phone:_____ Cellular/ Business Phone 786-444-5274

Fax:_____ Email: PHILLIPSMARINEGROUP @.

Salvor Signature X

Print Name BRYANT FILBRULEGE

4/28/2021                                                    Midnight Express 60 - Power & Motoryacht





Midnight Express 60

SIMON MURRAY · JAN 31, 2019

The World's Largest Center Console Interior

**The 60-foot Pied-A-Mer signifies a growing trend toward larger center consoles, giving new meaning to the term "space race." But has it topped out?**

At the height of the Cold War, the space race between the United States and Soviet Union became the logical extension of the growing arms race between the two competing international superpowers. When Sputnik was launched on October 4, 1957, it was the world's first artificial satellite sent into orbit by humankind. The Russians grabbed headlines by being first. But the Americans weren't far behind, launching their own satellite, Explorer I, three months later. And with those successful launches the race to space was on.

Almost half a century later, a different space race is afoot. Though earthlier in nature, and more concerned with space as it relates to comfort aboard, boatbuilders like Midnight Express and HCB have their sights set on building the largest center console possible. What once seemed like a preposterous notion—gigantic center consoles over 40 feet—was on full display at last year's Ft. Lauderdale show, where show-goers were treated to the debut of the  HCB 65 Estrella and Midnight Express 60 Pied-A-Mer.

## Gallery: Midnight Express 60

Have a closer look at the Midnight Express 60 in the gallery below:





GALLERY

9 IMAGES

"Do I think they really compare? No, it's such a different boat," said Midnight Express co-owner Eric Glaser when asked about the comparison. "But that doesn't mean people don't think about it. In a way, everybody who builds a center console to us is competition."

But with an emphasis on carbon fiber construction, bigger and bigger engines and a willing desire to boldly go where no one has gone before (in terms of LOA), the competition seems like a distant afterthought. A center console? The 60 is more like a rocket ship.

A 15-foot beam provides the 60 with multiple social spaces. That's important, because, according to Midnight Express, with the pins down, the four Seven Marine 627 outboards that provide a total of 2,508 hp will push Hull No. 1 to a top speed of over 60 knots. And that's just with the current engine options. The 60 can also accommodate six 400-hp Mercury Verado outboards—or twin 1,900-hp MAN diesels with surface drives that should clear 87 knots.

Belowdecks is where things really get interesting. Overnight accommodations are yacht-like: two equal-sized cabins, a full couch and galley. Taken together, they give new definition to the term "weekender." It also provides the 60 with the superlative "largest interior in a center console."

When Midnight Express revealed plans for a 60-footer, they immediately had a backlog of prospective owners, many of whom were interested in upgrading from their 43 Open. Three and a half years later, Hull No. 1 was completed, in part because the 100 or so employees at the builder's Miami facility couldn't build fast enough to keep up with demand.

"We built it all in house," said Glaser, "all the molds and everything. On my next project, I'm going to sub everything out and get it out quicker and should be able to punch them out faster." According to Glaser, the current backlog for the 60 is eight to nine months, with Hull No. 2 in mold. At press time, there was talk of building Hull No. 3 entirely in carbon fiber.

Which says nothing of the elephant in the room. "I have a hull mold for a bigger [center console]," said Glaser, "but it's not even on our radar right now. We have to see how the 60 does first. We're developing a boat right now to bridge the gap between the 43 and the 60; I hope to have that at Ft. Lauderdale next year." He just doesn't know if he's going to have enough space.

# Midnight Express 60 Specifications:

**LOA:** 60'
**Beam:** 15'
**Displ.:** 36,000 lbs.
**Fuel:** 700 gal.
**Water:** 99 gal.
**Standard Power:** 4/627-hp Seven Marine outboards
**Optional Power:** 6/400-hp Mercury Verado Racing outboards or 2/1,900-hp MAN diesel engines
**Top Speed:** 60 knots
**Base Price:** $1.6 million

**Click here for Midnight Express's contact information and index of articles ▶**

This article originally appeared in the February 2019 issue of Power & Motoryacht magazine.

4/28/2021                          Midnight Express 60 - Power & Motoryacht